Good morning, and may it please the Court, I'm Alfred Pfeiffer of Bingham McCutcheon. I represent the appellant TICKETS.COM in this matter. How are you? Very good, Your Honor. Thank you. I would like to reserve a few minutes at the end, time permitting. Same rule as the case before, and same rule as the case afterwards. Whatever's left on the clock, you own. Thank you, Your Honor. The district court in this case made fundamental errors of both fact and law that require reversal. There were four key factual issues that were genuinely disputed that should have been submitted to the jury but were not concerning Ticketmaster's market power. The Court found that there could not be market power as a matter of law, despite the evidence we had submitted that, in fact, there was market power, because of these four factual findings. First, the Court found that because there was bidding for some contracts, there could not be market power as a matter of law. There was bidding for all contracts, wasn't there? No, Your Honor, that's not correct. There was not. We submitted evidence that many contracts were renewed without bid, and that, in fact, Ticketmaster attempted. There were renewals on all contracts on an average of every six years, but not all were bidding? That's correct. Many were renewed without bid, and, in fact, that was something that Ticketmaster tried to orchestrate, was to have contracts awarded and renewed without going to us. Do you know, does the record reflect what percentage were non-bid? I don't believe it does reflect what percentage were non-bid, Your Honor, no. Could be 1 percent. Well, I don't believe the record reflects whether it's 1 percent or not, Your Honor. I mean, it could be 90 percent. Yes. I don't believe it's reflected in the record. Okay. Go ahead. The second issue that was improperly resolved was that the presence of sophisticated clients as a matter of law precluded market power in this market. The third was the fact that Ticketmaster entered into long-term contracts and, therefore, could not unilaterally raise prices. That was used as a basis to determine there could not be market power. And, finally, the court — That's factually wrong? That is factually wrong, in fact, Your Honor. Some of the contracts had escalators, but the contract — they did have contracts which were on the average, what, 6.2 years? I believe it was 6.1. Yes, Your Honor. Something like that. And they definitely said the prices do, didn't they? Well, yes, Your Honor. Subject to escalators. Subject to escalators. But we also submitted evidence, Your Honor, and I believe it's at Excerpt of Record 275 and 301, that there were instances in which Ticketmaster raised the service fees subject to its arrangement with the SFX, contract beyond what the contract provided. We submitted Ticketmaster documents that specifically talk about if we do this — if we do the arrangement that SFX is asking for at — there were two different locations, I believe — we will then make up for what we're paying SFX by raising the service fees. So they obviously, since they talked about doing it, had the ability to raise service fees beyond what was in the contract. It sounds to me what you're saying is that they had a spot amendment of the contract where they were asked to do something and they said, okay, we'll do this extra thing which is not in the contract, but we modify the contract by raising fees. That may be the explanation that Ticketmaster wants to offer for that at trial. That is not what the documents say. That is not in the record. I would submit that at this stage, when we are opposing summary judgment, we're entitled to all favorable inferences. The documents talk solely about them raising the prices. Now, I don't know whether they would have to get a spot approval from somebody or a formal amendment of the contract or whether they just did it. The record doesn't reflect that, and I think we're entitled to the most favorable inference possible from that evidence. But it doesn't preclude the possibility that it's an arena where the contract is up for renewal and hence new terms will be entered into, and they may be talking about raising the service fee for new terms. Actually, Your Honor, I think it does. It talks about existing relationships with those customers. I mean, they're talking about raising fees at a given point, not raising them on a renewal. An observation of what we're going to do in the future is sort of a thin reed for talking about actual behavior. I don't think these documents, in fact, are talking about what we're going to do in the future, much less in the context of what we do when we renew the contract. What they're saying is if we have to pay SFX this, this means we have to raise the ticket prices, the service fees to keep Ticketmaster whole. Exactly what are you trying to stop your competitors from doing? What are you trying to prevent? What are you trying to get rid of? Your Honor, that's an excellent question. I think it ties into the overall market structure of this market, and I think this is an opportune time for me to explain what we are asking and what we're not asking. We are not asking for there to be a permanent injunction against anybody ever having exclusive contracts, and I think that's how it's presented. We are not saying that exclusive contracts in and of themselves are per se unlawful. What we are saying is that there's an interlocking network of exclusive, long-term, non-terminable contracts, not just with 75 to 90 percent of the venues in the marketplace, but also with the largest promoter in the marketplace, Clear Channel, which dramatically, dramatically affects the availability of those venues to us and affects the availability of retail outlets to us. So I hear you saying that as an abstract matter, as a legal proposition, you're not trying to identify this anti-competitive problem with these exclusive contracts, but in the hands of this crowd, yes, you want to stop them from using those. I don't think that's quite right, Your Honor. What I'm saying is that in the aggregate. How are you going to get where you need to go without doing that? Well, and obviously that's a problem we'll grapple with when we get to the remedy stage, but let me give you my ideas about that. Have you thought it through? Yes, I have, Your Honor. Okay. Thank you. Well, how does it work? It's even in here. The way it would work, the specific challenges that I think the remedy phase would face would be to do away with the exclusive contracts with retail outlets that Ticketmaster has, particularly because we've identified evidence that retail outlets don't even want those, that retail outlets oppose those exclusive contracts, to eliminate the best efforts clauses with the contracts with Clear Channel and SFX, which have been used in an anti-competitive manner, and to make sure that contracts at least have reasonable termination provisions in them, which is what you find in all of this circuit's cases that have dealt with exclusive dealing contracts and not found liable. And if the consumer wanted a long-term contract and to stay with somebody for a long time because switching around IT is a mess, that would be prohibited by what you're asking for? Well, Your Honor, I think at the remedy phase, in fact, it could be. And I think that's no different than what happens at the remedy phase in any antitrust case. Your Honor, if you look back to the Kodak antitrust litigation that this court saw twice, in which I was involved in for over a decade, the remedy phase did prohibit Kodak from doing certain things that some consumers would have wanted it to do. And that's the nature of an antitrust remedy. That's a long way down the road. So how does this work now? You've got somebody out there, and you say, we want to be able to participate in this simultaneously with the other side. How does that work? How do you both sell tickets for the same thing at the same time? Well, actually, that, I think, Your Honor, is, again, not what we're asking. We're not asking for injunctive relief down the line that says, we must share every venue contract with Ticketmaster. What we're asking for is to change the nature of the competition, to change how the bidding process works to make sure that it is, in fact, a fair and competitive bidding process. And how do you think the bidding process ought to be changed? How should a court monitor the bidding process? What should the ground rules be? Well, and, again, I don't think it actually is as detailed or complicated as you're saying. It's not a matter of monitoring the bidding process on a bid-by-bid basis. What are the ground rules? So you want to alter it. What are the ground rules? The ground rules, again, I think, Your Honor, gets back to exactly what I told you, eliminating the problematic aspects of this troika of exclusive contracts. Eliminate the exclusive contracts with the retail outlets, and you will go a long way toward opening up a fair and competitive bidding process. That's one of the major barriers to entry that we. . . That strikes me as the weakest part of your case. Twenty-eight hundred. . . I mean, some really large number of retail outlets out there that fall into the category. The grocery stores, drug stores, sporting goods stores. And, you know, the Ticketmaster only has contracts with a few of them, a relatively small number. That strikes me as the weakest part of your case, where you could get other venues, and to interfere with the rights of third parties like this. I mean, they may very well prefer long-term contracts. And, Your Honor, that may be an excellent jury argument. And they may not want a situation where somebody can just duck out of the contract at will. And, Your Honor, that may be a great jury argument for them to present to the jury. We were, however, precluded from presenting to the jury the contrary evidence. But as a jury, you have to get by us. Yes, Your Honor. I well recognize that, Your Honor. So telling me that doesn't help you any. Your Honor, we submitted evidence. And what's the point of prohibiting this kind of arrangement that has entered the open market? We've got zillions of other vendors that you could enter into contracts with. Your Honor, that is, in fact, a disputed fact, and a materially disputed fact. The district court improperly weighed that evidence and said, there's good enough retail outlets out there so that you won't be adversely affected by that. That was an erroneous statement. Well, the evidence provided, at least given to us in the opposition brief, it seemed we had two key points on that, the first being that your client has submitted bids without having the retail network in place, has never had a problem satisfying the retail network requirement when your client won contracts, and the other, the numbers that Judge Kaczynski alluded to, that in the largest categories, something like 2,800 retail outlets out of 129,000 stores in the United States were signed up by Ticketmaster, suggesting an enormous potential for signing up somebody else, even if you don't go after the locations that Ticketmaster has contracts with. Your Honor, no different than the facts in Microsoft, which dealt with a very similar kind of chicken and egg problem. And the evidence, they like the sound bite of the fact that we submitted bids for 200 venues, or whatever it is, but it doesn't deal with the fact that venues, we submitted evidence from venues that they were not giving us bids and were not taking seriously our bids because we didn't have the retail outlets that they wanted in the networks. And we submitted evidence that Ticketmaster was telling venues that, in fact, what it argues here is not the case, that any venue will do. That they were going to venues and saying, we got warehouse, we got tower records, those are who you want, those are the record chains, and if you don't have those two record chains, then you're not going to get tickets sold. That's the evidence that's in the record. That is at least enough evidence to create a material issue of fact on that question. And again, the rest is for them to argue. It's a weight question. But we have submitted evidence from the venues that they value certain retail chains, that that makes a big difference, and that it was determinative to them in their decisions about us. And we have submitted evidence from retail chains that they did not want exclusivity, including warehouse. Can you spend a little time? I'm having some difficulty understanding the relationship between some of these players. Certainly you are. I understand the venues. The venues are the people who own a hall, right, like the Staples Center or something. Rose Bowl, whatever. Some place where you can actually do a performance, right? Yes, Your Honor. And they're the ones who have the seats and sell the tickets eventually. And then you've got your managers. SMG, venue managers. SMG. What exactly are they and what relationship do they play to the venues? And then you've got your promoter. And, again, maybe these are commonly understood concepts, but I have no idea how they. . . I'm happy to address that, Your Honor. Can you spend just a couple of minutes telling me how they. . . I'm somewhat intrigued by your argument about the best efforts clause in those contracts, but since I don't know how these parties interrelate, I don't quite know what it means or could mean in real life for these people to exercise best efforts. Certainly. And allow me to address what the record shows on that, Your Honor. The venues. . . That's my question. The venues you've talked about. The venues are, on the first level, the source of tickets. Every ticket at the Staples Center comes through Staples and they control where that goes. They are the source of ticketing in the purest abstract way. The venue managers like SMG come into the picture because what they do is come in and say, we will run all your day-to-day operations, including your operations with your ticket servicing provider, which is a tickets.com or a Ticketmaster. They are the ones who do the day-to-day interactions and Staples Center ownership no longer has to do that. And that gives them, in some instances, sole ability to control who the ticketing services company is and, in other instances, at least dramatic influence with the owner over who they're going to enter into that contract with. So that's step one is the venue and venue manager. So when it comes time to, let's say, renew one of these contracts. . . Just because it's close by and we all can visualize it. So they have a contract, let's say, with Ticketmaster. And the time comes to renew it. And let's say they have one of these managers in place. The decision to how to go about renewing the contract and whether to renew the contract and on what terms to renew the contract, will it be made by the manager or will it be made by the venue? Or does that differ? I would say in most cases it would be predominantly handled by the venue manager with, of course, approval at some level by the owner of the venue. Okay. So. . . One firm's got lots of different kind of owners. A lot of them are governmental. Some are private. Arrangements take lots of different forms. Which is correct, which I think actually goes to the sophisticated buyer issue because many of them are not, in fact, sophisticated in these circumstances. Okay. Step number two is the promoters. What does it mean in that context to exercise best efforts on behalf of the. . . I mean, what real-life effects does that clause have? Let's say you have an arrangement like this where you have a venue that has a manager and it has as a manager whatever this SMG or whatever. In the record, I think what we have seen is that the managers have given. . . The SMG has given the contracts to Ticketmaster in all circumstances where it's possible to do so. And, in fact, has also. . . Why would they do that? Because they get a cut. They get an additional fee. They get a slice of the pie, if you will, from Ticketmaster. Where does that cut come from? From the service charges. From the service fees that Ticketmaster charges. I'm sorry. I'm not completely. . . For every ticket that Ticketmaster or tickets.com. . . Both do this. Yeah, everybody. This is how ticketing services companies get paid is they provide their ticketing services and for each ticket that's sold through them, they tack on a service fee. I'm well aware of that. I've paid that fee off myself. We've all paid those fees. That part I understand very well. What I don't understand is how does SMG get a piece of that action? Pursuant to this exclusive long-term contract that they have with Ticketmaster. That's the terms of that contract is they get a slice out of every ticket sold pursuant to this contract. Out of Ticketmaster's share of the servicing fee? I mean, if you've got an arrangement where the venue gets part of it and Ticketmaster gets part of it, presumably Ticketmaster can't reduce the venue's share.  So they're getting some piece of its own share. That's correct. Is that arrangement one that's commonly made known to the venue owner itself? I don't know that that's on the record, Your Honor. The reason I'm asking is if they're getting a piece of the sales from, let's say, Ticketmaster, and they are hired to manage the venue for, let's say, Staples, aren't they in a sort of conflict of interest situation at that point where if they're... An astute observation, Your Honor. Well, I'm asking a question. I believe that is. I would guess that the people who own Staples, one of these venues, is not stupid enough to let that happen for too long. I think the evidence, to the extent that there is evidence on this, shows two things, that the venues are not as sophisticated as is presented. There is evidence that is, in fact, a very complicated process to figure out whether the increasing, and they are steadily increasing, service charges, in fact, net out against the other revenue that venues receive from parking and concessions and all the rest. And we submitted evidence in the record that that is a difficult calculation to do. Let me ask you some other questions. If you have a cut of the tickets, you don't really need the best efforts provisions. I mean, we let greed take care of that, don't we? I mean, the best efforts provision itself doesn't do very much because you can't very well sue on it. If you are getting a cut of the tickets, that's a very different situation because they have an incentive, of course. There is a direct financial incentive and also a contractual requirement. There is a best efforts clause, and I presume they don't put it in necessarily. Tell me about the promoters. Yes, Your Honor. We'll give you a little more time for a bottle, but why don't you tell me about the promoters. Thank you, Your Honor, because I did want to address promoters. Promoters matter here because they control the talent. That's what the promoters do. All right. Okay. Tell me. Not that you might know anything. Okay. SFX, which is now Clear Channel, it bills itself as the largest promoter of live entertainment in the world. That's in the record. They control acts, and again, these are in the record, too, acts like the Rolling Stones, Sting, Billy Joel, all kinds of, they are the 800-pound gorilla of live entertainment. So let's say the Rolling Stones want to do a tour. These people would decide which cities they do it in. And which venues within geographic markets they go to. And we submitted specific evidence. The Rolling Stones are a great example. They have a contract with Ticketmaster. They also have a contract with Ticketmaster which has a best efforts clause in it to use Ticketmaster ticketing services, not just at the facilities where Clear Channel controls the ticketing selection, but at all places where Clear Channel entertainment, where Clear Channel talent is performing. And they have, we've submitted evidence that they are using that leverage. The San Francisco Giants testified that even though they wanted to give the contract and did give their general ticketing services contract to Tickets.com for Pacific Bell or Pacific Bell Stadium, that they had to opt out of that all Clear Channel performances. So we lost a portion of what Pac Bell Stadium would have preferred to give to us because Clear Channel came to them and said, you want the Rolling Stones? You better pick Ticketmaster for our events. And so that was worked into the contract to our direct disadvantage. And Ticketmaster submitted. Did they get a piece of that as well? Yes.  That's again in the record that where Clear Channel procures the use of Ticketmaster services, it gets a cut. And that's the circumstance under which I said the evidence says we at Ticketmaster then raise the fees to keep Ticketmaster whole. So that is, and we submitted evidence again that by Ticketmaster's telling of it, there was a document, I believe it's at the excerpt of Record 276, listing 11 different venues where by Ticketmaster's account, Clear Channel was ramping up the pressure on people to use Ticketmaster. We'll give you a couple of minutes for rebuttal. Thank you very much, Your Honors. Good morning. I'm Bob Cooper. I'm Gibson Dunning Crutcher on behalf of Ticketmaster. Let me make a couple of sort of broad comments first and then try to turn to some of the issues that were raised just a moment ago. When you stand back and look at this, what it is is a lawsuit where a competitor is complaining about contracts the customers want. No customer. Is that true with regard to the retail outlets? Yes. If that came up specifically and we were told, and I suspect it's probably the case, that the warehouses and tower records don't necessarily want to be bound to an exclusive arrangement. It may be true with regard to the venues, but I haven't heard a reason why the retail outlets should want to restrict themselves to one ticket brand. Fine. Let me make one point. I do not consider the retail outlets as a customer here. They are not the relevant market. They are part of the apparatus that is used to deliver the service. I understand that distinction, and I think you may be right with regard to the venues and the contracts, the so-called long-term, but one thing that suggests itself here is that we've got a couple other arrangements which are being identified as part of the problem, notably the arrangements with the retail outlets and the venue managers and the promoters. And as to none of those, have I heard anything being offered up to explain why those arrangements are in the best interest or desired by the other parties to those contracts in a way that should preclude or keep the court from striking them down if necessary for relief here? Well, let me first point, Your Honors, to Excerpt of Record 20, which is Tickets.com's answers to interrogatories where they explain the reasons why they enter into exclusive arrangements or agreements with outlets. They do so because of the cost of the arrangement. They do so because they want to have a stable working relationship with the outlet at established and predictable prices, which they'll pay the outlet. And they want to have an outlet identified with them so that in the future, customers will know that's where they go, if it's Tickets.com, to actually get the tickets for a Tickets.com event. But more importantly, let me address this by making the point, which was already observed here. There are endless, endless retail outlets out there that are available. If I may, I'd like to hand up several exhibits that are undisputed. These are exhibits that show for some of the venues that were addressed in the court proceedings. Have you given them to closing counsel? I will do it right now. These are excerpts of the record. They start at 219. These are just examples, Your Honor, of the extent to which there are available retail outlets out there. In the brief, I think we provided a figure which shows that. Blue is available. These are the establishments in the various retail categories, and the yellow shows you Ticketmaster. What does that mean? I mean, you can get lots of mom-and-pop stores all over the country, but there's only one in a few Tower Records warehouse. I don't even know what. There's only one Sports Chalet. I mean, really, there are only a few big competitors nationwide, just like there's one Bloodbusters and one Hollywood Video, right? There's one or two national chains. I don't know if that's the place where you sell tickets. But if you get the national chains on certain kinds of outlets, you pretty much got it locked up, which is what people. I just don't think there's any evidence to support that. Let's just take a look at a couple of these. Common sense. Even common sense. Just look at Exhibit 13 in this, for example. Exhibit 12 is a good example. It's L.A. It's L.A., and I'm looking here in the one, 12, Los Angeles metro area. And I run down in 204. It's 223. I run down and look at the outlets identified as music, and at least grocery stores appear to be wide open, apartment stores appear to be wide open, but music stores, maybe not quite so wide open. I mean, Ticketmaster has warehouse, has Tower Records. And warehouse is now bankrupt. This must be all exclusive. The point, very simply, is that, at least the point that certainly Judge Huff relied upon, is that there's just an endless number of outlets out there. But you have to combine that with some other critical factors here, too, also about retail outlets. You've got undisputed facts which really establish the critical point, which is that the required investment for setting up a network, an outlet, is only $5,000. And the way these bidding competitions take place, they're long in advance. They're almost a year in advance of when the contract is going to be renewed or comes up. And as a result, if a tickets.com comes in and wins the bid of a major venue, it can go in. And with that lead time and find the retail outlets that will be sufficient, there's no problem on minimum viable scale with the major outlets. It's admitted and undisputed that it pencils out. When you win a major venue, you can go in and establish the retail outlet network and make money. You've got a situation where tickets.com told every customer when it competed that it could and would have no trouble setting up the retail outlets. And then when you go through each. Now, do the customers believe that? Well, Your Honor, it seems to me at that point the obligation is on the plaintiff here to come in with evidence that that is, in fact, the case. And you're not going to see. And according to what we were just told a few minutes ago, there's evidence that Ticketmaster uses in its sales pitch to the venues the fact that they've got the hot retail outlets already signed up. And we were just discussing where that evidence was, and I'm not sure we know how to identify what the counsel was referring to. Certainly, the fact that you may find one example where someone suggested that, gee, we have some better outlets. There was an interesting situation in San Francisco, which is referred to in their brief, and I think Your Honor should know. This is not the strongest part of their case. Why don't you talk about the strongest part of their case? And that is those best efforts clauses. The best efforts clauses. The sort of troubling revelation today that I wasn't aware of, that actually the venue managers are getting a piece of the tickets, of what Ticketmaster collects. That's a little troubling. And I don't understand where that is in the record, and I don't understand that to be the case. Basically, you have. . . I'm sure I'm about to let counsel give me a citation. Let me spend a moment on best efforts as I understand that situation. We're talking about two contracts. We're talking about SMG. SMG is a venue manager. They would tend to manage venues that are owned by government entities. They negotiate. They have negotiated a contract with Ticketmaster, which provides for their managed venues an extra $0.10 per ticket sold, which goes to the venue. That is. . . And they don't get a. . . That's my understanding. And I don't think there's any evidence. . . This is a new understanding. I'm really interested in what's in the record. The contract is in the record, and I don't know that I have the cite to it. What I'm really asking you is, do they, as far as the record reflects, get, they, the manager, get a piece of that, of what Ticketmaster collects, directly or indirectly? Do they get a piece of it?  They, the managers. The answer is, I do not believe that is the case. I do not believe there's any evidence that supports that. Tickets.com chose to never take the depositions of SFX. I don't believe they took the deposition of anyone from SMG. So your answer is no. I mean, I don't mean to. . . My answer is no, based on what I. . . As far as the record is concerned. But the record certainly. I'm not asking for your secret knowledge or anything like that. You might know the answer to this for a fact. But if it's not in the record, I'm not interested in hearing it. So, as far as you're telling me anything, you can keep secret anything you know that's not in the record. Just so we understand each other. It would be a lie if you know the answer but it's not in the record. So all I'm asking is, does the record reflect anything that involves the kickback? I don't mean kickback because it sounds pejorative. But something where the venue manager gets a piece of the ticket price from Ticketmaster. Your Honor, I do not know of anything in the record that reflects that. Okay. And. . . That's fine. What the record does reflect, however, on this, I think it's very important, is that there's really no evidence that any venue chose Ticketmaster, used Ticketmaster because it was pressured by FSX to do so. There's literally one document that Tickets.com cites to. It's a letter from a smaller. . . So what is the effect of the best efforts clause? You've got this clause in there, which the record said sounded suspicious or fishy. And I must tell you, it sounds suspicious or fishy to me, too. We've got a contract with SFX, which in effect says. . . So SFX. That's Clear Channel now. It's a promoter. I'm confused. I'm getting confused about the SPG or something. Don't confuse me anymore. They are. . . Let's say Clear Channel. Okay, Clear Channel it is now. The thing with the initials. SFX is a promoter that also has its own. . . Clear Channel. I'm sorry. I've been using SFX for too long. Clear Channel. . . Stop it now. Is a. . . Is a promoter. Is a promoter that also owns venues. Right. And it has a contract for its own venues. Yes. And then it has provisions that says when you're not. . . When you're showing at somebody else's venue, you're going to use best efforts to get them to use Ticketmaster. And that applies to open venues. Because if the venue has a contract already with Tickets.com, for example. . . Well, of course. Then that venue is already tied up. Where there is an open venue, and there are some. . . Then pursuant to the contract, Clear Channel agreed to use their best efforts to get us. . . What does that mean? Well, you have to ask the question, what does it mean? Because my way of thinking, best efforts clauses are pretty meaningless. And in fact. . . Well, you can't. . . Plaintiffs can cite to no evidence. . . You can't put some in there. And they have a financial incentive, presumably. They do. Because if they're using us, they have a. . . What they think is a better deal, perhaps, than the venue would have. And what happens under those circumstances is that Tickets.com then has to give a better deal to the venue. . . In order to win the business. It's just a competitive measure. What sense did they get a better deal? I didn't hear you. I'm sorry. You said they think they get a better deal. What does that mean? The SFX contract would provide terms. . . You're doing it again. I'm sorry. I'll whisper clear channel to him whenever you say it. The contract is SFX's contract in the record. But the clear channel has negotiated a deal. And when they put an event into a venue, which they do not own, under this contract, they would get something from us if we are used as the ticketing contractor. Which means that Tickets.com. . . So you do get. . . They do get a piece of the action. That's not the SMG contract. That is the. . . I was actually thinking about both. But that's fine. So the promoter does get an incentive. Does get a piece of the ticket price. They could. So in other words, they would then have an incentive to look for venues that are open. Because if they pick a venue that somebody else has covered, they will preclude themselves from earning that incentive. Not at all. Because then Tickets.com or another ticketing service company simply comes in and says, we'll give you the same terms, clear channel. It's just competition. The critical point here is there is no evidence to show that this best efforts clause had any impact on competition. That's where there's a total failure of evidence in the record. I'm losing track of what's in the record and what's been said. So I'll go back and look. But I think I have heard from someplace or seen someplace references to clear channel being motivated and actually electing or steering their programs to venues that are Ticketmaster venues and venues being induced or induced to sign with Ticketmaster or discouraged from signing with Tickets.com because they won't be able to get the Rolling Stones show if you sign up with Tickets.com. The latter, I do not know of any evidence in the record to that effect. I'm aware of two items of evidence that plaintiffs refer to in the record as to clear channel or SFX. One is a letter from a small venue, which obviously Tickets.com had visited and said, look, consider us. And the venue says, you know, we have a close relationship with SFX. Sorry, that's what they said. And and we think we're to stay with Ticketmaster. Now, that letter doesn't say that SFX took any steps or action to bring that about. That's one piece of evidence. And that and the other piece of evidence is is Pac Bell Park. And the facts there are interesting. That's a venue where we competed against Tickets.com and lost it to Tickets.com despite SFX or clear channel as it became. And then what they point to is the fact that later Clear Channel came to Pac Bell Park and in effect said, when you do a live music concert, we don't we do not want you to use Tickets.com. There is no evidence that that approach had anything to do with a best efforts clause. The evidence is very clear. It had to do with the fact that Tickets.com had suffered a massive failure when it did try to do one of these big on sales for a live music concert. And SFX or Clear Channel later was simply unprepared to risk that with a live concert. These on sales, I'm sure you all have bought tickets for some of these. I know a couple of you probably have. No, they're massive endeavors. I mean, what an on sale is when a ticket for a very popular event goes on sale is typically 10 a.m. Saturday morning that can sell out in minutes. And you've got to have everything up and running across your whole network and running beautifully. And if you have any sort of a breakdown, it's a disaster. And that's the background of that piece of evidence. So what's the disaster? You you. It takes 20 minutes to sell a ticket. It can take even less, even less than that. The demand is if you have this, if the minutes sell out in three minutes, if you don't have a disaster, what does the disaster consist of? You go all the way to noon before you sell out. What does this has to look like? You still fill the hall, right? I know. It sounds to me like the kind of event where if you bought the tickets. In the one instance, I was lucky. So it just means somebody else got the tickets. You get a lot of mad people. It's the same ticket that four people. You can have all kinds of problems. In one instance, they just the sale collapsed. They had to redo it. That sort of thing can happen. It's not it's not an easy event, as you might imagine, according to the Internet phone box office and then the outlets do it all through a computerized system. Whenever every system is jammed, it can back up real fast. But but that's an aside. I mean, my point is very simply that the best efforts clause, the plaintiffs have an obligation to come forward and show that there was an adverse impact on competition. It was not just temporary. And that was substantial. And they have not come up with the evidence to do that. They failed totally on that point. They literally have one letter. At which of a venue they never deposed. And then they have this Pac Bell example. By the way, what is the Pac Bell example again? That even though they won the venue, Pac Bell said when when they went when Clear Channel went to put on a live concert, they came to Pac Bell and said, we want you to use tickets. We want you to ticket master because but not the reason is very clear in the testimony. It is that they had no faith in tickets.com's ability to handle the on sale. And that you'll find that maybe they said that because they didn't have faith. Maybe they said it because they got a cut of the tickets and they used ticket master. And maybe they were just being diligent. I mean, they do their best efforts. This was their best effort. How do we know? But it seems to me it's up to the plaintiffs to offer some evidence to contradict the only evidence on the record, which is it was because of the inadequate on sale. And the point with respect to the deal that Clear Channel had with our client Ticketmaster, that's easily matched by tickets.com in a nanosecond in terms of the dollars. I see my time is up. I will thank you all. Okay. Thank you. We've got a couple minutes for rebuttal. Thank you, Your Honor. Let me start with the question of the fees for Clear Channel and SMG. The Clear Channel fee appears at page 184 of the excerpt of record and does recite that there is, in addition to a multimillion dollar signing bonus as part of this contract, there is a per ticket fee being paid to Clear Channel for promoting Ticketmaster. The SMG. What about this argument? And I do want to do the citation, but what about this argument that your client can just match that? Well, since they've signed them up to a long-term exclusive 10-year contract, I'm not quite certain how we'd have the ability to match that, Your Honor. And the other thing I would point out is for them to say, well, this is perfectly okay and a good deal and not anti-competitive is contrary to their own admissions, which is that excerpt of record 268 when there was a bundling of ticketing services and talent being promoted by an adversary. They wrote in and said, our lawyers have told us this is flat-out illegal and you have to stop this immediately. But if we with 90% market share do it, I guess it's okay. Your Honor, that goes dramatically to their intent in doing this, and it's an anti-competitive intent. The second site that you asked for, the SMG contract, is that excerpt of record 197, and that specifically says, we'll establish a national rebate program pursuant to which Ticketmaster shall pay to SMG an amount equal to $0.10 per ticket sold by Ticketmaster or any of its directly controlled affiliates. $0.10 per ticket paid from Ticketmaster to SMG. That's the record on that contract. Tell me, I was looking at this chart we got about the outlets, retail outlets. Yes, Your Honor. Why isn't Savon just as good as anybody else? And they seem to be open. I mean, where is it written that you have to use music stores, Robinson's May, Tower Records? Written largely by Ticketmaster, Your Honor. In fact, we've submitted evidence in which they have persuaded the market that it has to be the people they have tied up. Well, that's the people that they have tied up. Why isn't, I mean, people can just as easily go to Savon or to Rouse or to Rite Aid or to Albertson's as to music. Is there some synergy particularly with music stores? Yes, in fact, and there's evidence in the record on that, Your Honor, where Ticketmaster is telling prospects and also prospects are telling us the type of stores matters. Now, they, again, may persuade a jury that what they told the venues was not in fact correct, but that's a fact question for the jury to resolve. There is evidence on our side of the scale on that issue. One more issue, Your Honor, if I may. On the question of retail outlets, everybody seemed to accept that there was evidence that retail outlets don't want exclusive contracts. There is also evidence that the venues do not want the terms, at least in all instances, that are being proposed to them by Ticketmaster, and I think that is an important point. The venues have asked for different terms, including unsponsored. When you say terms, what do you mean? Duration? Actually, non-exclusivity. We submitted evidence. It's a quote from the CFO of Ticketmaster that venues have routinely, that's his word, routinely asked for services to be unbundled, that they not have to take all their ticketing services from Ticketmaster, but be free to get some of them from elsewhere, and that Ticketmaster has consistently refused to do that. But I don't recall that really being part of what you're saying needs to be changed. As I understand, unbundling, you've got these four different outlets, and Ticketmaster says we've got all four or we don't do it, and that's why they didn't get Major League Baseball or something like that. I haven't recognized your complaint as being Ticketmaster has to be made to do individual streams, can't say it's all four. I've read lots of other things complaining about what they do, but I haven't seen that one. Well, if that's the complaint, then I'm not sure what the arenas are saying is very pertinent. It is part of the complaint. It is one of the entry barriers that we have established in this case, or at least established the fact dispute as to, is the existence of long-term exclusive non-terminable contracts with the venues themselves. That part I know about. It's hard to miss, but the idea of they have to agree. Would you say that Ticketmaster has to be required to sign contracts that don't cover all four streams? I guess what I would say is that it cannot insist that its clients or prospective clients take exclusive contracts if the clients don't want them. Yes, Your Honor. I don't know. I've probably more than exceeded my time and your patience. So if you have no further questions, I will thank you. Okay, cases, I will stand submitted. We'll take a short recess before the next of the remaining two cases in the calendar. All rise. This court will stand at recess for approximately five minutes.
judges: Kozinski, Trott, Clifton